# WESTERN TELEPHONE CORPORATION OF TEXAS v. McCANN et al.

### No. 9261.

Court of Civil Appeals of Texas. San Antonio.

Feb. 21, 1934.

Rehearing Denied March 21, 1934.

Sylvanus M. Thomas, of Glen Falls, N. Y., W. B. Moss, of Sinton, John. C. North, of Corpus Christi, and T. M. West and Nat L. Hardy, both of San Antonio, for plaintiff in error.

M. A. Childers, of San Antonio, and J. C. Russell, of Sinton, for defendants in error.

SMITH, Justice.

This action was brought against the telephone company by Jack McCann and his five minor children for damages occasioned to them by the death, by lightning, of Mrs. McCann, the wife and mother of the plaintiffs. In a jury trial the plaintiffs recovered an aggregate sum of $15,000. The telephone company has brought writ of error. The plaintiff in error and defendants in error will be herein designated as appellant and appellees, respectively.

The McCanns resided north of Taft, in San Patricio county, in a small rented frame-house situated about 50 feet north of and facing a paved highway, running approximately east and west. Appellant's telephone lines were strung on wooden poles, 20 feet high and about 180 feet apart, along the north edge of the highway. One of these poles was situated in front of the McCann home, about 36 feet distant. The home of one Nelson was situated about 400 feet west of and on a line with the McCann place.

The telephone line in front of the McCann

home consisted of two wires, one a through and the other a local wire. The local wire had formerly served telephone instruments in the McCann and Nelson homes. It came to a dead end in the living room of the Nelson home; the service having been discontinued and the instrument removed from both homes long prior to this accident, and before the McCanns moved into their place.

When in use, the instrument in the McCann place had been served by a "lead-in" wire, which may be designated here as a "drop" wire, extending down from a connection with the local wire on the pole in front of the house. There is evidence that after the discontinuance of the service to the McCann home, the drop wire was disconnected at the pole from the local wire, and tied to the glass insulator carrying the local wire, in close proximity to the latter. It is undisputed, however, that at the time of the accident the drop wire was attached to, or at least was in contact with the local wire, at that insulator. It is conceded that at and long prior to the McCanns' occupancy of the house, the terminus of the drop wire had been brought to a dead end upon a porcelain insulator spool spiked by an ordinary nail to the southwest corner of the McCann front porch, at the intersection of the corner post and the place or sill just below the eave of the porch. Appellant had knowledge of this situation.

The accident occurred during a heavy rain and electrical storm. Some of the family were working with a stalled truck near the house. The evidence vaguely, but sufficiently shows that Mrs. McCann had stepped out of the west room onto the small front porch, presumably watching the activities at the truck. Her young daughter was holding open the screen of the front door, near her mother, who, presumably if not certainly, was near the porch post and the dead end of the drop wire attached thereto. At this juncture a terrific bolt of lightning struck the first telephone pole to the east of, and 180 feet from, the pole in front of the house, demolishing the pole and severing the through wire, one part of which was thrust upon the branches of a nearby palm, which thereafter died, apparently as a result of the contact. The local wire was not severed, or "burnt," but sagged downward, intact. The first, second, and third line poles to the east of the one destroyed were split down to the ground on the south side of each. The sill, or 4x6 plate, of the McCann front porch, to which the dead end of the drop wire was attached at the intersection

of sill and southwest corner supporting post, was split for a distance of three or four feet beginning at the insulator spool holding the dead end of the drop wire. (If Mrs. McCann was standing in the position indicated by the facts, her head was near and slightly below this dead end of the wire.) The facing and sill of the east side of the door to the front room, just behind Mrs. McCann, who was between it and the insulator spool, was "burst and torn loose" by the lightning, which also injured the screen of the door as it was held open by the daughter, who was knocked down and injured by the impact. A gas meter at the east end of the porch was injured. The lightning also penetrated the ground near the base of the demolished pole, unearthing a buried line of gas pipe which extended to and beyond the disturbed meter.

Now, as stated, at the moment of the crash Mrs. McCann was standing or moving about on the west side of the porch near the dead end of the drop wire and between it and her daughter as the latter held the screen open. The testimony is vague concerning her precise position, or attitude, or movements. In the confusion following the shock, however, she was discovered prone on the ground, just off the west end of the porch, dead. Lightning had contacted her head and breast, passing down the length of her body and through one of her feet. It made no impression upon the floor of the porch, or other objects in her immediate vicinity, except, as stated, upon the porch sill on one side of her and the screen and door on the other, upon her daughter, who was felled by the shock, and upon the gas meter at the far end of the porch.

The jury found, in answer to special issues, that Mrs. McCann's death did not result from the act of God, or unavoidable accident, and was not contributed to by her own negligence; that her death was caused by lightning conducted over appellant's telephone line; that appellant negligently "left its telephone wire connected with plaintiffs' residence or permitted it to be and remain connected therewith after the telephone had been removed, without having installed therewith a lightning arrester or having said line grounded or connected with the ground with a conductor of electricity," which negligence proximately and directly caused her death.

Appellant put on much expert testimony, developing three theories upon which the accident could have happened, as follows:

"(1) A single discharge may have occurred and in its path to the ground may have divided into three paths, one leading to the tele-

phone post that was demolished, another branch leading to the palm tree that was killed, and a third branch leading to the corner of the porch on which Mrs. McCann was standing.

"(2) Two discharges in rather rapid succession which the people in their excitement failed to notice; one striking the porch and killing Mrs. McCann and the other demolishing the telephone post.

"(3) The discharge could have hit the post and divided at the top of the post, one part following the post to the ground and demolishing it, the other part following the telephone wire to a second post, about 150 feet west of the post that was demolished, and from the second post following a wire leading to the corner of the porch on which Mrs. McCann was killed."

 The jury, by their findings, adopted the third theory, and appellant's first proposition is, in effect, that appellees failed to support those findings by a preponderance of the evidence, and were therefore not entitled to recover; that being the only theory pleaded by them. We have concluded that the evidence did support the jury's findings and therefore overrule the first proposition, as well as the related second, third, and fourth propositions.

Appellant's theory is, in short, that the accident was not, could not have been, caused by current generated by the main bolt and conducted over appellant's wires to Mrs. McCann, but that there were several distinct and independent bolts, or "side flashes" subsidiary to the main bolt, one striking the line pole, another the palm tree, and another Mrs. McCann, directly and without the intervention of appellant's wire. Appellant advances numerous circumstances in support of this theory.

It is argued, first, that the drop wire could not have carried sufficient current to wreak the damage to the porch and death to Mrs. McCann without "burning" the wire, which in fact survived the shock without apparent impairment. It is true that there was much expert testimony as to the capacity or lack of capacity of such wire to carry destructive current without injury to the wire, but the experts admitted, nevertheless, that the wire could carry enough current to kill a human being and yet show no signs of injury to its own structure. From this evidence and admission, and all the circumstances of the case, we conclude that the jury were warranted in rejecting appellant's contention upon this point.

It is further argued by appellant, in opposing appellees' theory, that the local wire, along which the death current was conducted to the drop wire leading to the McCann porch, came to a dead end in the Nelson home, 400 feet beyond the McCanns, and yet wrought no damage to that home; that if the current conducted by that wire had in fact wrought the alleged havoc at the McCann house, the same current would necessarily have damaged the Nelson house. This contention seems to be based upon the assumption that the drop wire leading to the McCann porch was detached, at the line pole, from the local wire ending at the Nelsons. But, while there was evidence of such detachment, it was contradicted and, being contradicted, must be rejected in support of the implied finding that the drop wire was attached to the local wire. Besides, there was evidence warranting the inference that the current could have "jumped" from the local to the drop wire. From this situation it is apparent that the jury found that the current, generated by the bolt of lightning and communicated to the local wire, was conducted through that wire to the connection with the drop wire and was diverted or deflected to, and down the latter to its dead end at the porch and from there to the body of Mrs. McCann, and other nearby objects, as it sought the ground. By this process the Nelson house escaped the fugitive current.

It is further and lastly argued by appellant that appellees' theory is disproven by the fact of the claimed injury to the palm tree, which stood four or five feet from the line pole upon which the bolt seemed to concentrate. It was at this pole that the through wire was severed. One of the severed ends was thrust upon the branches of the palm tree, which afterwards drooped into an apparently fatal illness. There seems to be considerable question of whether this condition of the palm tree was occasioned by the lightning. Appellant asserts that the tree is a victim of lightning, and that the injury resulted, not from contact with the charged wire, but from a bolt distinct from the main bolt, or a distinct fork thereof, thus proving, incidentally, asserts appellant, the theory that there were several distinct strokes, one of which struck Mrs. McCann, whose death is attributed by appellant to the bolt, rather than to a wire-conducted charge. It is stoutly asserted by appellant that the injury to the tree could not have come from the falling wire end, because the electric current communicated to the wire from the lightning could not have been retained in the wire until it contacted the

tree; that "The duration of a current from a stroke of lightning is fixed by Professor Work (a highly regarded authority) at 'only a few millionths of a second.' It is referred to by Professor Shimek as less than one thousandth of a second." The point is a fine one, indeed. But it is easily conceivable, nevertheless, that a bolt of this power and intensity could thrust the severed wire to the very nearby tree so quickly as to make the two events simultaneous. Certainly, common knowledge, the experience and observation of mankind through all the ages, forbid mere man to say that the bolt of lightning could not put that wire on that tree in time to communicate its deadly charge to the tree. The jury were fully warranted in rejecting this incidental contention of appellant.

It may be technically true, as appellant and its experts contend, that the phenomena of lightning is "highly complex," rather than "freakish." As a practical matter, the uncertainties inherent in a bolt of lightning may not be encompassed in either or both of those terms, or in any term of any known language. It is known, only, that it is all-powerful, all-embracing, inconsistent, inscrutable, searching, terrifying, beautiful, deadly. It is no respecter of persons, places, or occasions.

But certain of its qualities and tendencies have been evolved out of the experiences of the ages. It is known, for example, that an electric current generated by lightning and discharged against an object takes the shortest available path to the ground, albeit, the shortest available path may be the longest natural path, as stated in effect by one or more of appellant's expert witnesses, whose probity and learning, it should be said here, have raised them to high places in the educational and scientific structure of our country. And so it is known that lightning takes the path of least resistance electrically. More than that, and peculiarly pertinent here, is the familiar rule that a metallic wire is a favored channel for electric current and a favored target and outlet and deadly instrumentality of lightning.

Giving application to these rules here, it was well within the province of the jury, in view of the evidence, to attribute the deplorable event in this case to the drop wire which led from its contact with the line wire to a dead end on appellees' porch. The line wire was strung east, apparently to the exchange at Taft, and west to the Nelson home, 400 feet away. The next pole to the east, 180 feet away, was the one upon which the bolt of lightning vented its concentrated force, destroying it as if it were made of glass. The bolt generated the currents which wrought the death and destruction evidenced all about. It sought numerous outlets. One tentacle blasted a hole in the ground at the base of the pole, searching out and exposing an underground metal gas main. One clung to one end of the through wire to kill the palm tree, while another coursed eastward along the other end of the severed wire blasting down the full length of the next line pole 175 feet to the east, and the next, and the next, where its remaining force appears to have been exhausted, or found refuge, in the earth, 500 feet from the point of its origin. The remaining tentacle seized upon the local wire and followed it west to its intersection with the drop wire, which it seized in turn and followed downward to its dead end on the porch plate, blasting the latter, killing Mrs. McCann (the next nearest target), felling her daughter, partially shattering the adjacent door and screen. This theory is not only supported by the testimony and the patent physical facts and circumstances, but by specific allegations in appellant's special defense of the contributory negligence of Mrs. McCann.

■■ Summarizing the foregoing conclusions, we hold, in brief, that appellant was bound to know the potential dangers of its wires wherever placed, and to use ordinary care to safeguard persons and property from those dangers. It was bound to know that the drop wire attached to the McCann home was a potential carrier of electrical current generated by lightning, which might occur at any time, and that in such contingency it might result in the very injury complained of in this case. With this knowledge appellant was under the duty to use ordinary care to equip its exposed wire with such known devices as would prevent or minimize that danger to any lawful occupants of the premises. It was undisputed that the only known safeguards against such dangers, other than actual removal of the wire, were to "ground" it, or equip it with a "lightning arrester." Appellant concedes it made no effort to provide either safeguard. In this situation the jury were authorized to find, as they did, that leaving the wire there and failing to provide those safeguards constitute negligence, and that such negligence was the proximate cause of Mrs. McCann's death. 26 R. C. L. p. 39, et seq., §§ 39, 40, 41; 37 Syc. p. 1639; Southern Tel. & Teleg. Co. v. Evans, 54 Tex. Civ. App. 63, 116 S. W. 418 Writ Ref.; Texas Tel. & Teleg. Co. v. Scott, 60 Tex. Civ. App. 39, 127 S. W. 587 Writ Ref.

■ In its first and second propositions appellant complains of the second special issue

to the jury as follows: "Question No. 2: Do you find from the preponderance of the evidence that defendant left its telephone wire connected with plaintiff's residence, or permitted it to be and remain connected therewith after the telephone had been removed, without having installed therewith a lightning arrester or having said line grounded or connected with the ground with a conducter of electricity? Answer this question 'yes' or 'no.'"

The first objection to this issue is that it is duplicitous, in that it submits more than one separate issue of fact to the jury, to wit: (1) Did appellant "leave its line without being grounded or connected with the ground with a conductor of electricity?" (2) Did appellant fail to "have properly installed and in operation a lightning arrester?" (3) Did appellant leave "its telephone wire connected with plaintiff's residence," or (4) permit it to be and remain connected therewith?" We conclude that a sufficient answer to these objections is that the issues here pointed out by appellant were conclusively established by all the evidence thereon, including that of appellant's own witnesses. It was admitted that appellant left the wire connected with the McCann house ungrounded and without lightning arrester, and it is therefore immaterial whether those issues were submitted separately or collectively, or at all.

It is further objected that said special issue No. 2 "informs the jury that some duty or obligation rested upon defendant to watch over and care for said wires after the telephone had been removed from said residence." This objection presents no error, for certainly the duty did rest upon appellant, as a matter of law, to use ordinary care to neutralize the dangers inherent in the wire it left on the premises. Appellant's fifth and sixth propositions are overruled.

The jury awarded damages of $10,000 to the decedent's widower, and $1,000 to each of the five minor children, consisting of three daughters, aged 19, 16, and 6, respectively, and two sons, aged 14 and 12, respectively. In its assignments of error 19, 20, and 21, appellant complains of this verdict, asserting that as to the widower it was excessive, and as to the children it "shows to have been rendered without due consideration for the evidence, and without evidence to support such answer and to have been based solely upon a desire to give each of said children a lump sum regardless of their ages for the amount of damages they may have sustained, if any, for the amount of compensation for the services that might have been expected by each of said children, in that their ages range from six to nineteen years." We overrule the contention as to the father, it not appearing from the record that the award to him is so palpably excessive as to show the jury arrived at the amount through improper consideration. Nor do the objections made to the award to the children present reversible error. It is not asserted that the award is excessive as to any particular minor, and, it not being excessive as to either, appellant cannot complain that it is discriminative as to the others. The objections that that award was made "without due consideration for the evidence and without evidence to support" it, and the like, do not specify error with that particularity required in assignments.

The judgment is affirmed.